IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ALVIN JOHNS,

        Plaintiff,

    v.

CITY OF EUGENE, OFFICER
YOLANDA CONNER, and OFFICER
BRYAN INMAN,

        Defendants.

Case No. 6:16-cv-00907-AA
**OPINION AND ORDER**

AIKEN, District Judge:

In this action, plaintiff Alvin Johns asserts various claims under 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights as well as state-law negligence and intentional infliction of emotional distress claims. Defendants, the City of Eugene ("the City") and Eugene Police Department Officers Yolanda Anderson[1] and Bryan Inman, move for summary judgment on all claims against them. For the reasons set forth below, defendants' motion is denied as to plaintiff's Fourth Amendment claim against the individual officers, denied as to the vicarious-liability negligence claim against the City, and granted in all other respects.

---

[1] The complaint used Officer Anderson's former surname, Conner.

## BACKGROUND

Special rules of construction apply when evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). As such, this section is stated in the light most favorable to plaintiff, with all questions of material fact resolved in his favor.

On the evening of August 3, 2014, Betsy Jean Castleton appeared at plaintiff's home with a strong odor of alcohol on her breath and insisted on seeing plaintiff's adult son, Alvin Johns II ("Mr. Johns II"), who was her friend and coworker. Given the time of night and Ms. Castleton's intoxicated state, plaintiff refused to allow her inside his home. Despite plaintiff's repeated requests, Ms. Castleton refused to leave. Plaintiff grabbed a metal baseball bat, pointed it at Ms. Castleton's chest, and told her, once again, to leave the premises. At some point, Ms. Castleton fell down backwards, landing on her own cell phone. Awoken by the commotion, Mr. Johns II emerged from the house to see Ms. Castleton lying on the porch screaming "bloody murder" at his father, who was standing over her with a baseball bat. Miller Decl. Ex. 2 at 4, Aug. 22, 2017. Ms. Castleton and Mr. Johns II both began yelling at plaintiff, threatening to beat him up and send him to the hospital. Plaintiff retreated into the house and locked his door.

Once inside, plaintiff phoned 911 for assistance. According to the transcript of that call filed in support of the City's motion for summary judgment, plaintiff reported that he was inside the house and that Mr. Johns II and Ms. Castleton were outside, yelling at him and threatening him. The 911 operator could hear people yelling in the background. When the 911 operator

asked him if there were any weapons involved in the altercation, plaintiff immediately stated that he had a baseball bat.

Four officers were dispatched to the scene: defendant Officers Anderson and Inman, and non-defendant Officers Kyle Evans and Robert Rosales.[2] By the time the officers arrived, Mr. Johns II and Ms. Castleton had left the area. Plaintiff met the officers in front of his house and identified himself as "the one who called." *Id.* As plaintiff began to explain what had happened, Mr. Johns II returned to the vicinity. As Mr. Johns II approached, he became extremely agitated and started yelling at plaintiff. The officers directed plaintiff to go back into his house in order to separate the two men.

According to Officer Anderson's investigation report, Mr. Johns II stated that he was angry because plaintiff had hit Ms. Castleton with a baseball bat. Officer Anderson then spoke to Ms. Castleton. Ms. Castleton stated that she had gone to the house to check on Mr. Johns II and that she was worried because Mr. Johns II told her that his father beat him. She asserted that she had gone to the door and asked to see Mr. Johns II, but that plaintiff had told her to come back the next day. She further stated that about thirty seconds after the door closed, she decided she wanted to leave a message for Mr. Johns II, and that when she knocked on the door a second time, plaintiff appeared in the doorway with a baseball bat in his hand. She reported that plaintiff "put the bat to [her expletive] throat" and told her to get off the porch. Anderson Decl. Ex. 1 at 3. She then alleged that plaintiff pushed the baseball bat against her throat with enough force that she fell to the ground, dropping her cell phone beside her on the porch. Ms. Castleton stated that she told plaintiff she was going to call the police, at which point plaintiff "went

---

[2] Plaintiff initially included Officer Evans, Officer Rosales, and Ms. Castleton as defendants in this lawsuit. The claims against Ms. Castleton were dismissed without prejudice in February 2017. Doc. 44. The claims against Officers Evans and Rosales were dismissed with prejudice in July 2017. Doc. 53.

psycho the [expletive] on [her] phone" and began smashing it with the baseball bat. *Id.* She told Officer Anderson that when she attempted to reach for the phone, plaintiff raised the bat over his head and swung at her. Ms. Castleton stated that plaintiff missed four times because she scurried out of the way, but hit her "one good time" with the bat. *Id.* at 4.

The report states that Officer Anderson "did not see any redness or swelling" on Ms. Castleton's chest or throat (despite Ms. Castleton's statements that her chest and throat hurt the most) but that she did observe "a bump, red marks and swelling on the right side of her back." *Id.* Officer Anderson smelled a strong odor of alcohol on Ms. Castleton's breath. Photographs taken by the officers show a cell phone with a shattered screen and a welt on Ms. Castleton's back. The officers did not test the phone see if it was still operable. When Ms. Castleton told the officers she needed her phone, they gave it back to her without asking why she needed a demolished phone. Officer Anderson stated in her deposition that an examination of plaintiff's bat revealed "sparkles, like little glass particles" on the end, but that fact is not documented in either the investigation report or the probable cause affidavit. Michaels Decl. Ex. 1 at 7. The bat was not seized as evidence and no photos of it appear in the summary judgment record. The officers did not examine the porch, which is constructed of soft fir wood, for evidence that it had been hit with a bat.

Officers Anderson and Inman then went into the home to talk to plaintiff. Plaintiff admitted to using the baseball bat to "direct" Ms. Castleton off the porch by pointing the bat at her chest. *Id.* He denied making any physical contact with Ms. Castleton and denied smashing her cell phone. When Officer Anderson asked how Ms. Castleton ended up on the ground, plaintiff responded, "[s]he fell from being drunk I guess." *Id.* In his deposition, plaintiff stated that the officers asked him several times to explain what happened. It appears that plaintiff

became frustrated with the officers' repeated questions and asked them "if I did [smash her phone] what it if was on my property[?]" Anderson Decl. Ex. 1 at 4. When the officers asked if that was an admission that he had in fact smashed the phone, plaintiff reiterated his denial and said they were "twisting [his] words" and that he "didn't see a phone." *Id.* At some point, Officer Inman suddenly "called [plaintiff] an [expletive] liar and bum rushe[d him] from approximately 8 feet away and grab[bed plaintiff] like [he] was about to hit his coworkers." Miller Decl. Ex. 2 at 5.

The officers believed Ms. Castleton, a white woman, rather than plaintiff, a black man, and arrested plaintiff. Plaintiff was charged by information with menacing and criminal mischief in the second degree, both misdemeanors. Plaintiff remained in custody for three days and because his release agreement forbade him from being within a mile of Ms. Castleton, the City forced plaintiff out of his home. In order to comply with the terms of his release, plaintiff rented a room in a hotel for twenty-three days at a cost of approximately $1,350. The terms of the release agreement also prevented plaintiff from visiting a doctor in San Francisco and taking a long-planned trip to see a football game in Seattle.

Several months later, an Assistant District Attorney ("ADA") took the case to the grand jury to consider the addition of a felony charge. Through Ms. Castleton's testimony, the ADA learned that Ms. Castleton had continued to use her phone after the attack. Ms. Castleton also described the attack in a way that was not consistent with the evidence documenting her injuries. The ADA pulled the case from the grand jury and dismissed all charges.

Plaintiff filed this civil rights action in May 2016. On February 15, 2017, I denied defendants' motion to dismiss. *Johns v. City of Eugene*, 2017 WL 663092 (D. Or. Feb. 15, 2017). Defendants now move for summary judgment on all claims.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex*, 477 U.S. at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

### I.    *Fourth Amendment*

Defendants move for summary judgment on plaintiff's claim that the individual officers violated his Fourth Amendment rights. Defendants argue that plaintiff's claim fails because, on the undisputed facts, a reasonable officer could conclude that there was probable cause to arrest plaintiff for several crimes including assault, harassment, criminal mischief, and menacing. Defendants also assert that the officers are entitled to qualified immunity. Plaintiff responds that the truth of the "undisputed" facts submitted by defendants is at issue, and that inconsistencies between Ms. Castleton's story and the available physical evidence triggered defendants' duty to investigate further before arresting him.

### A.    *Merits*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend.

IV. "[A]n arrest is lawful . . . only if it is accompanied by probable cause to believe that the arrestee has committed, or is committing, an offense." *Conner v. Heiman*, 672 F.3d 1126, 1132 (9th Cir. 2012) (citation and quotation marks omitted).

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Whether probable cause exists depends 'on the totality of facts[.]'" *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (quoting *Lopez*, 482 F.3d at 1073). While probable cause does not require law enforcement officers to support their seizure with "certainty or even a preponderance of the evidence," officers must be able to conclude that there is a "fair probability" that the defendant committed a crime, *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006), and "may not disregard facts tending to dissipate probable cause," *Sialoi*, 823 F.3d at 1232. Finally, while law enforcement officers do not need "conclusive evidence of guilt" to support seizures with probable cause, "mere suspicion, common rumor, or even strong reason to suspect" a plaintiff engaged in criminal conduct are not enough to establish probable cause. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (citation and quotation marks omitted); *Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citation and quotation marks omitted).

Defendants assert probable cause supported plaintiff's arrest for several crimes. As evidence supporting probable cause, defendants focus on the fact that Ms. Castleton described being threatened with a bat and that she was able to show a fresh welt on her body and a shattered phone screen to the officers at the scene. Because arrests based on probable cause only

require a "fair probability" that an offense has been committed by the arrestee under the totality of the circumstances, defendants argue that there was probable cause to arrest plaintiff.

Plaintiff contends that his arrest was on mere suspicion, in violation of his Fourth Amendment Rights. He argues that the probable cause affidavit omits multiple relevant facts. In particular, plaintiff points to the facts that (1) he was not intoxicated at the time of the incident, whereas Ms. Castleton was; (2) Officer Anderson could not see any redness or swelling on Ms. Castleton's chest or throat area, undermining Ms. Castleton's report that she was hit in the chest so hard she fell down; (3) Ms. Castleton's cell phone was intact and operable after alleged repeated blows by a metal bat; (4) the swelling on Ms. Castleton's back and damage to her phone were more consistent with plaintiff's contention that she fell than with Ms. Castleton's allegation that plaintiff struck her and the phone with a bat; (5) the officers should have suspected that Ms. Castleton was not telling the truth about the bat hitting her phone because she asked to have the phone back, suggesting that she knew it remained operable; and (6) plaintiff, not Ms. Castleton, was the person who had called 911. Plaintiff argues that the officers ignored these facts, all of which tended to dissipate probable cause, and failed in their basic duty to investigate evidence before making an arrest.

Viewing all the evidence in the light most favorable to plaintiff, I conclude that there remain issues of material fact as to plaintiff's Fourth Amendment claim.

To support their probable cause argument, defendants largely rely on Ms. Castleton's statements and physical evidence observed by the officers. The allegedly corroborating physical evidence, however, is not sufficient to definitively establish probable cause. I begin by addressing the allegation that plaintiff attacked Ms. Castleton with a bat. Considering Ms. Castleton's report that she was hit so hard in the chest that she fell down and it hurt the most in

the chest area, the absence of any redness or swelling on that part of her body could permit a jury to conclude that defendants should have questioned Ms. Castleton's version of events.

Second, I consider the allegation that plaintiff smashed Ms. Castleton's phone. Here, the fact that her phone was still operable and intact after violent blows could support the conclusion that the officers should have known the screen was shattered in some other way—for example, as plaintiff suggested, as a result of Ms. Castleton falling down due to intoxication. And even though the officers would not know from visually inspecting the phone that it remained operable, a jury could conclude either that they should have tested the phone right away, or that Ms. Castleton's statement that she needed the phone back undermined her story because it suggested she knew the phone was still working. Moreover, although glass shards on the end of the bat clearly would have corroborated Ms. Castleton's story, a jury could question Officer Anderson's veracity regarding her examination of the bat because the officers did not take the bat into evidence and there is no documentation of visible glass on the bat in the investigatory report or probable cause affidavit.

A jury could conclude that these inconsistencies between Ms. Castleton's statement and the physical evidence triggered the officers' duty to investigate further. Had such an investigation been conducted, the officers might have learned from Mr. Johns II that Ms. Castleton's phone "always had a broken screen." Michaels Decl. Ex. 7 at 2. They might have examined the soft fir wood of the deck and found no evidence that plaintiff had hit the wood when he missed Ms. Castleton.

Finally, these evidentiary inconsistencies must be considered together with the fact that Ms. Castleton was intoxicated while plaintiff was sober, that plaintiff summoned the police to his house, and that plaintiff readily admitted to using a baseball bat to get Ms. Castleton to leave

(though not in the way she alleged). Collectively, the evidence gives rise to substantial disputes of material fact that are determinative in establishing the existence of probable cause.

B.     *Qualified Immunity*

As an alternative basis for summary judgment, defendants argue that qualified immunity bars plaintiff's Fourth Amendment claim against the individual officers because "any mistake they made about the existence of probable cause in this case was reasonable." Defs.' Mot. Summ. J. 12.

Qualified immunity gives "government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation marks omitted). Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted).

Courts use a two-pronged inquiry in resolving the question of qualified immunity at the summary judgment stage. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). First, courts ask whether there is a violation of a federal right. *Id.* Next, courts consider whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Courts have discretion to decide the order in which to engage these two prongs. *Pearson*, 555 U.S. at 236. To determine whether qualified immunity protects defendants, the "relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 194–95 (2001); *see also Anderson v. Creighton*, 483 U.S. 635, 640 ("The contours

of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Courts cannot "define clearly established law at a high level of generality" and must consider the "violative nature of *particular* conduct[.]" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in *Mullenix*). Such specificity is especially important in the Fourth Amendment context, as it is sometimes difficult for an officer to determine how legal doctrine will apply to a given factual situation. *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier*, 533 U.S. at 201). Nonetheless, a "case directly on point" is not required for the law to be clearly established. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013). The question is whether "existing precedent . . . placed the statutory or constitutional question beyond debate." *Id.*

Defendants argue that, even if the individual officers violated plaintiff's Fourth Amendment rights, qualified immunity still protects them because the violation was based on a reasonable mistake regarding the existence of probable cause. Defendants aver that this case "is precisely the type of situation qualified immunity is designed to address," considering the conflicting witness accounts and physical evidence. Defs.' Mot. Summ. J. 12. Plaintiff counters by reiterating his argument that, given the conflicts between Ms. Castleton's statements and the physical evidence, the officers had a clearly established duty to investigate further before arresting him. Specifically, plaintiff cites a Tenth Circuit case stating that it is established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably . . . investigate basic evidence[.]" *Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007) (en banc). Plaintiff also cites two Ninth Circuit cases stating that the officers must independently investigate the basis of citizen witnesses' or alleged victims' knowledge, despite the presumed

reliability of witness statements. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2000); *Fuller v. M. G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991).

For the reasons set out in Section I.A of this opinion, *supra*, a jury could conclude from the summary judgment record that the individual officers lacked probable cause to arrest plaintiff. For qualified immunity purposes, then, the question is whether the officers' conduct, viewed in the light most favorable to plaintiff, violated clearly established law.

Even in the absence of directly on-point precedent, I conclude that the individual defendants are not entitled to qualified immunity at the summary judgment stage. At a minimum, it was beyond debate at the time of plaintiff's arrest that if (1) all available physical evidence conflicts with a purported victim's version of events and is consistent with a purported perpetrator's version of events; (2) the alleged perpetrator is the one who called the police for help; and (3) the supposed victim is intoxicated and the supposed perpetrator is sober, there is a duty to investigate further before making an arrest. Here, the only physical evidence was the bruising on Ms. Castleton's back (which a jury could find conflicted with Ms. Castleton's allegation that she was hit hardest in the neck and chest and/or was more consistent with falling down backwards than with being hit by a bat), the shattered cell phone screen (which a jury could find conflicted with Ms. Castleton's statements that plaintiff destroyed her phone by hitting it two or three times with a metal bat), and the shards of glass allegedly visible on the bat (which the jury could doubt existed based on the failure to take the bat into evidence and the absence of any mention of the glass shards in the investigation report and probable cause affidavit). Moreover, it was plaintiff who called the police, and he was sober whereas Ms. Castleton was intoxicated. In sum, if the jury views the evidence in the way plaintiff urges, the

officers' decision to arrest plaintiff violated clearly established law. The individual officers are not entitled to summary judgment on plaintiff's Fourth Amendment claim.

C.     *Municipal Liability*

Defendants also move for summary judgment on plaintiff's Fourth Amendment claim against the City. As to his Fourth Amendment claim, plaintiff's municipal liability arguments rest entirely on his assertion that the City "ratified" the actions of the individual officers by permitting him to sit in jail for several days when a review of the Probable Cause Affidavit would have revealed the illegality of his arrest.[3]

In a civil rights action under § 1983, a municipality cannot be held liable on a simple theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978). Instead, the "municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[,] the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Whether relying on formal or informal policy, the plaintiff must ultimately show the municipality consciously disregarded the consequences of its action or inaction. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Because courts apply "rigorous standards of culpability and causation," the plaintiff must show that the violation of a constitutional right is the "obvious consequence" of the city's alleged policy, *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 405, 410 (1997), or that the policy presents an "unjustifiably high risk of harm," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

---

[3] Plaintiff initially based his *Monell* claim on a failure-to-train theory, but makes no argument in support of that theory in the briefing on the motion for summary judgment.

Plaintiff argues that the City "ratified" his arrest by letting him remain in jail for three days after being notified of his arrest and the facts surrounding his arrest. Pl.'s Resp. Defs.' Mot. Summ. J. 16–17. In their reply, defendants provide two counters. First, they argue that this new theory, which was never made in plaintiff's pleadings or discovery, should not be allowed at this juncture. Second, defendants aver that, even if the Court were to consider the new theory, it is without merit. Defendants point to legal authority showing that the only individuals with policymaking authority for the City of Eugene are the City Council, City Manager, and Chief of Police, and that there is no evidence that any of those policymakers ratified the allegedly unconstitutional actions of individual defendants.

Defendants are correct that the evidence here is insufficient to permit plaintiff's claim against the City to go forward. To proceed on a ratification theory, a plaintiff must show that an official with final policymaking authority "expressly approved" the decision of a subordinate and that the decision was "cast in the form of a policy statement." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Neither "[s]imply going along with discretionary decisions made by one's subordinates" nor "fail[ing] to investigate the basis of a subordinate's discretionary decisions" amounts to ratification. *Id.* Because there is insufficient evidence to show that a policymaker for the City of Eugene ratified plaintiff's arrest, defendants are entitled to summary judgment on plaintiff's Fourth Amendment claim against the City.

II. *Fourteenth Amendment*

Defendants next move for summary judgment on plaintiff's claim that individual defendants violated plaintiff's right to equal protection under the Fourteenth Amendment. Defendants argue that the mere fact that plaintiff is black, Ms. Castleton is white, and the arrest may have been unsupported by probable cause is insufficient to raise an inference of

discrimination, and that plaintiff failed to present further evidence of discriminatory intent. Plaintiff maintains that race and gender provide the most reasonable explanation for the officers believing Ms. Castleton even though relevant evidence corroborated plaintiff's version of events.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, and prevents "official conduct discriminating on the basis of race," *Washington v. Davis*, 426 U.S. 229, 239 (1976). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors v. Pena*, 515 U.S. 200, 229–30 (1995).

"To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001) (citation and quotation marks omitted). Because plaintiff may ultimately prove discriminatory intent by direct or indirect evidence, "[p]roof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment." *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F .2d 1104, 1112 (9th Cir. 1991), *superseded on other grounds as explained in Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005); *see also id.* at 1113 (explaining that courts look for evidence of discriminatory intent in § 1983 claims in the same way courts search for discriminatory intent in employment discrimination cases). As such, "in an equal protection claim based on *selective enforcement* of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 591 (9th

Cir. 2008) (citation and quotation marks omitted) (emphasis in original); *see also Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000) ("There is a constitutional right, however, to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons.").

Citing this Court's prior Opinion and Order ruling on defendants' motion to dismiss, plaintiff argues that there is sufficient evidence to show that "race-based consideration consciously or unconsciously motivated law enforcement officers' conduct." Pl's Resp. to Defs.' Mot. Summ. J. 16. While that argument was sufficient at the pleading stage, "[t]o defeat summary judgment the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, 'set forth specific facts showing that there is a genuine issue for trial.'" *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

In my prior Opinion and Order, I stated that plaintiff's allegations that the individual officers were motivated by racial bias, combined with plaintiff's assertion that physical evidence corroborates his story and not Ms. Castleton's, gave "rise to a plausible inference" that the officers' conduct was motivated by race-based considerations. *Johns*, 2017 WL 663092 at *5. It is important to distinguish a plausible inference at the motion to dismiss stage from a plausible inference in the summary judgment context. At the pleadings stage, a claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Because a motion to dismiss is filed prior to discovery, greater leaps in logic are permitted; if it is reasonable to infer that discovery could lead to evidence of discriminatory intent, the case may proceed. For a summary judgment motion, however, plausible inferences solely based on the

complaint are not enough, as the parties have had an opportunity to obtain relevant evidence through discovery.

A close reading of the prior Opinion and Order reveals that I denied defendants' motion to dismiss plaintiff's Fourteenth Amendment claim because they "[asked] the Court to apply heightened pleading requirements" when the Ninth Circuit has clearly rejected such proof requirements "at the pleadings stage[.]" *Johns*, 2017 WL 663092 at *5. I further elaborated the different standards applicable to motions to dismiss and motions for summary judgment by stating that the case law on which defendants relied was "not illustrative of how the Ninth Circuit approaches motions to dismiss, since it was a decision on a motion for summary judgment after plaintiff had the opportunity to make a record through discovery." *Id.* Having clarified that making out a plausible inference of discrimination at the motion to dismiss stage is not in and of itself sufficient to satisfy the summary judgment standard, I now look to the evidence provided by plaintiff.

Plaintiff points to two declarations filed in support of its response to defendants' motion to dismiss. After reviewing those declarations, I have no choice but to conclude that plaintiff failed to identify specific facts demonstrating a genuine issue for trial. My reasoning for that conclusion is twofold.

First, the declarations fall short of showing that racial bias has so infected the Eugene Police Department ("EPD") that a jury could find there is a municipal policy or custom of permitting racially motivated arrests. "A plaintiff cannot prove the existence of a *municipal* policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) (emphasis in original). Rather, the custom must be so "persistent and widespread" to

constitute a "permanent and well settled" city policy. *Monell*, 436 U.S. at 691. Liability for improper custom "must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984)); *see also Meehan v. L.A. Cty.*, 856 F.2d 102 (9th Cir.1988) (two incidents not sufficient to establish custom); *Davis*, 869 F.2d at 1230 (manner of one arrest insufficient to establish policy).

The first declaration is from Charles Dalton. Dalton came to Eugene in 1975 as a student at the University of Oregon. Within less than an hour of his arrival, an EPD officer stopped him for providing a cigarette to another young black man. Later, in his capacity as the spokesperson for NAACP, Dalton learned that the EPD kept a photo book of all black men in Eugene who stayed more than a week, and that his picture was also in that book. In the 1990s, Dalton was instrumental in pursuing a lawsuit brought on behalf of two young African-American men wrongly arrested by the EPD. *See Ross v. City of Eugene*, 950 P.2d 372 (Or. Ct. App. 1997). The second declaration is from Eric Richardson, the president of the Eugene-Springfield area NAACP. Richardson's declaration quotes Dalton's declaration at length, adding only one new relevant factual allegation: that after Richardson's sister called the police to help her mentally ill son, they instead arrested the son and forcibly detained Richardson's sister. *See Elliott v. City of Eugene*, 2017 WL 2174956 (D. Or. May 17, 2017).[4]

In granting or denying a motion for summary judgment, I am constrained to ruling on the evidence presented by the parties. I am fully aware of the racial bias prevalent in our society and

---

[4] *Elliott* went to trial on claims of excessive force against two City of Eugene police officers. *Elliott v. City of Eugene*, D. Or. Case No. 6:16-cv-00022-MC, doc. 87. The jury found in favor of defendants on one claim and deadlocked on the other claim. *Id.* doc. 134.

I am deeply concerned about its implication in the policing context. But the evidence *in this summary judgment record* cannot sustain a Fourteenth Amendment claim due to its sporadic and anecdotal nature. The declarations document several problematic policing practices, but most of the cited incidents happened twenty, thirty, or even forty years ago. The declarations discuss only one contemporary incident of allegedly racially discriminatory policing. In sum, the evidence is too thin to support an inference that EPD has either a "persistent and widespread" custom or a "permanent and well settled" policy to permit racial biases to drive its arrest decisions. *Monell*, 436 U.S. at 691.

Second, there is no evidence to support plaintiff's Fourteenth Amendment claim as to the individual officers' actions. Plaintiff did not, for example, provide any direct evidence of discriminatory intent such as derogatory statements about a particular race. *See Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014). Nor did he point to some evidence in the record showing that he was treated differently from similarly situated individuals of other races. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005). Neither declaration addresses any facts relevant to the individual officers' actions as they relate to plaintiff's Fourteenth Amendment claim. Plaintiff's sole evidence of discriminatory intent with respect to his Fourteenth Amendment claim is that he is a black man, Ms. Castleton is a white woman, and available evidence corroborated his story and conflicted with Ms. Castleton's story. That evidence is simply insufficient to permit the equal protection claim to proceed to trial. *Cf. Elliott*, 2017 WL 2174956 at *6 (granting summary judgment to the defendant officer on the equal protection claim because "the mere fact that a plaintiff is a different race than an officer" is insufficient evidence to withstand a motion for summary judgment).

Defendants satisfied their initial burden to show that plaintiff "does not have enough evidence" to proceed to trial on his Fourteenth Amendment claim. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Because plaintiff failed to identify specific facts demonstrating that there is a genuine issue for trial as to his equal protection claim, defendants' motion for summary judgment on plaintiff's Fourteenth Amendment claim is granted.

III. *Negligence*

Defendants next ask for summary judgment on plaintiff's negligence claim. This claim is asserted against the City only, and it rests on two theories. First, plaintiff contends that the City is directly liable for "negligently hiring, training, supervising, and/or disciplining defendants." First Am. Compl. ¶ 39. As noted in Section I.C, *supra*, plaintiff appears to have abandoned any failure-to-train theory by declining to introduce evidence or make any arguments to support that theory. The summary judgment record is similarly devoid of information about the City's hiring, supervisory, or disciplinary decisions. Accordingly, plaintiff's direct-liability negligence claim cannot proceed to trial.

Second, plaintiff argues that the City is vicariously liable for the individual officers' failure to "exercise reasonable care in the performance of their official duties." *Id.* ¶ 38. Defendants argue that this vicarious-liability negligence claim must be dismissed because it is based on intentional conduct. Defendants aver that an intentional act, like an arrest, can support a negligence claim only under very narrow circumstances not present here. *See Murphy v. City of Portland*, 585 P.2d 732, 733 (Or. Ct. App. 1978) (allowing a claim for negligent false arrest when officers arrested the wrong person). In support of this argument, defendants rely on

*Kasnick v. Cooke*, 842 P.2d 440, 441 (Or. Ct. App. 1992), in which the Oregon Court of Appeals held that "there is no such thing as a negligent fist fight."

I rejected this argument at the pleadings stage, but recognizing that a different standard applies at the summary judgment stage, I will revisit it here. I remain convinced that *Kasnick*'s rule is inapposite here. Defendants cite a string of District of Oregon cases that have stated, often in broad terms, that intentional conduct like an arrest cannot support a negligence claim. A closer look at those cases reveals that they all involved plainly intentional conduct such as use of excessive force in arrest or being rude and disrespectful during an investigation. *See, e.g.,* *Wagoner v. City of Portland*, 2017 WL 2369399, *11 (D. Or. May 31, 2017); *Rodrigues v. Jackson Cty.*, 2015 WL 404577, *4 (D. Or. Jan. 29, 2015); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1110 (D. Or. 2013); *Coleman v. Hubbard*, 2013 WL 3047306, *4 (D. Or. June 15, 2013). It is difficult to see how negligence principles could be applied to such scenarios, which do not involve a failure to exercise due care to avoid a foreseeable risk of harm. But plaintiff's negligence theory is best framed as one of negligent investigation, which is an entirely different sort of claim. *See Mendive v. State, By and Through Children's Serv. Div.*, 794 P.2d 807, 808 (Or. Ct. App. 1990) (recognizing the tort of negligent investigation). It is easy to see how an officer's failure to appreciate obvious red flags in a purported victim's story might be unintentional and yet still unreasonably create a risk of wrongful arrest.

Defendants next argue that plaintiff's negligence claim cannot survive summary judgment because it rests on the same factual allegations that underlie his Fourth Amendment claim. They cite a string of cases from this Court, all of which hold that, at the summary judgment stage, a plaintiff cannot maintain a negligence claim if that claim is based on the same facts that give rise to his constitutional claim under § 1983. Defendants are correct that, for the

past thirteen years, is has been the District of Oregon's consistent practice to bar negligence claims from proceeding to trial under such circumstances. *See Gregory v. City of Newberg*, 2015 WL 5577755, *8 (D. Or. Sept. 21, 2015); *Rodrigues*, 2015 WL 404577 at *4; *Frank v. Cascadia Healthcare Cmty., Inc.*, 2013 WL 867387, *5 n.5 (D. Or. Mar. 6, 2013); *Woods v. Gutierrez*, 2012 WL 6203170, *12 (D. Or. Dec. 12, 2012); *Barringer v. Clackamas Cty.*, 2010 WL 5349206, *9 (D. Or. Nov. 22, 2010); *Hadley v. City of Beaverton*, 2010 WL 1257609, *14 (D. Or. Feb. 16, 2010); *Whitfield v. Tri-Metropolitan Transp. Dist.*, 2009 WL 839484, *11 (D. Or. Mar. 30, 2009); *Saberi v. City of Portland*, 2006 WL 2707995, *4 (D. Or. Sept. 18, 2006); *Shilo v. City of Portland*, 2005 WL 3157563, *1–*2 (D. Or. Nov. 22, 2005); *but see Rodriguez v. City of Portland*, 2009 WL 3518004, *2 (D. Or. Oct. 21, 2009) (limiting this practice to the summary judgment stage and permitting negligence and § 1983 claims predicated on the same facts to proceed to discovery).

Some of the cases listed above have suggested that this principle is settled law. *See Whitfield*, 2009 WL 839484 at *10 (stating that "a state law claim [based] on the same set of facts as [a] civil rights claim" is "not permitted under the current law of this District"). That is a mischaracterization of the effect district court decisions have on future cases. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)); *see also Starbuck v. City & Cty. of S.F.*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The doctrine of stare decisis does not compel one district court judge to follow the decision of another.") In other words, there is no law of this District apart from the law that has been announced by the Supreme Court and the Ninth Circuit.

This makes good sense; even the federal courts of appeals issue precedential decisions in only a fraction of the cases that come before them. *See Hart v. Massanari*, 266 F.3d 1155, 1161 (9th Cir. 2001) (noting the "almost four-fifths of the merits decisions of courts of appeals" are issued in the form of unpublished memoranda, and so are not binding precedent). That is because writing "a precedential opinion . . . is an exacting and extremely time-consuming task." *Id.* at 1177.

> A judge drafting a precedential opinion must not only consider the facts of the immediate case, but must also envision the countless permutations of facts that might arise in the universe of future cases. Modern opinions generally call for the most precise drafting and re-drafting to ensure that the rule announced sweeps neither too broadly nor too narrowly, and that it does not collide with other binding precedent that bears on the issue.

*Id.* at 1176–77. Due to the volume of disputes we must adjudicate as district court judges, giving each decision precedential effect would substantially undermine the circuit-wide goal of "developing a coherent and internally consistent" body of case law to govern district courts in the Ninth Circuit. *Id.* at 1176. Rather, district judges assist in the development of that consistent body of law by carefully considering the principles to be applied in each case, checking one another's work, and disagreeing with each other when a question is close. These practices permit novel legal questions to percolate up to the appellate court, where they can be settled by a panel of three judges.

I do not mean to suggest that we district judges must reinvent the wheel every time we issue a decision. Uniformity in judicial decision making has value and prior decisions of the same district court carry persuasive weight. When a district judge departs from the decisions of her colleagues (or from her own prior decisions), she should have good reasons for doing so— and she should explain those reasons. Here, I have given due consideration to the decisions of my colleagues. I also note that I issued one of the preceding opinions. However, having

carefully reviewed the case law, I conclude that neither federal nor Oregon law prohibits negligence claims and civil rights claims based on the same set of facts from proceeding to trial together.

The rule that a negligence claim cannot proceed to trial when it arises from the same facts underlying a § 1983 claim was first announced in *Shilo*. *Shilo* is also the only case of those listed above to provide a rationale for the rule; each of the other cases simply cites *Shilo* (or one of the subsequent cases applying *Shilo*) without any reasoning as to *why* a negligence claim and a § 1983 claim cannot be based on the same facts. In order to explain my departure from this longstanding consensus, therefore, I examine *Shilo*'s reasoning in some detail.

In *Shilo*, the plaintiffs sued the City of Portland and certain named police officers, asserting § 1983 claims for unreasonable search and seizure and excessive force as well as a state-law claim for negligence. *Shilo v. City of Portland*, 2005 WL 2083014, *1 (D. Or. July 25, 2005). The defendants filed a motion for summary judgment. This Court denied the motion as to the federal claims but granted summary judgment on the negligence claim.

> Although mere negligence cannot sustain a § 1983 claim, qualified immunity from § 1983 may not preclude a separate claim based on common law negligence. Thus, as a matter of principle, the court recognizes that a plaintiff may allege negligence as a basis for recovery separate from § 1983 for acts arising in the Fourth Amendment search and seizure context. The negligence claim, however, should not be founded on the same facts that give rise to the § 1983 claim. Then the question becomes how a court should evaluate these claims under Oregon negligence law.

> . . .

> The court finds the test adopted by the Eleventh Circuit [in *Lewis v. City of St. Petersburg*, 260 F.3d 1260 (11th Cir. 2001)] to be particularly instructive: "A separate negligence claim based upon a district act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force. Nevertheless, the negligence component must pertain to *something other than* the actual application of force during the course of the arrest." *Lewis*, 260 F.3d at 1263 (emphasis added) (citations omitted). This test is faithful to the principles

previously articulated as it will not preclude plaintiffs from pursuing negligence as a possible avenue of recovery, but at the same time, it does not subject police officers to liability for negligent use of excessive force. It may be possible, for example, to allege a § 1983 violation for the use of a flash-bang device, and separate negligence claim if that flash-device, left unattended, starts a fire.

. . .

To support [their] negligence claim, plaintiffs reallege the very same facts that were used to make out claims for unreasonable search and seizure. As alleged, these facts do not give rise to a district act of negligence. Plaintiffs fail to make any allegation separate from that which gives rise to a claim of excessive use of force or improper knock and announce.

*Shilo*, 2005 WL 3157563 at *1–*2 (some citations and internal quotation marks omitted).

In *Lewis*, police officers in the St. Petersburg, Florida, fatally shot a man through his windshield while he was stopped at an intersection. 260 F.3d at 1261. The plaintiff, as representative of the decedent's estate, sued the City of St. Petersburg, asserting a § 1983 excessive force claim and a state-law claim for negligent use of a firearm. The district court granted the City's motion to dismiss, and the plaintiff appealed only the dismissal of the negligence claim. Among other reasons, the district court based its dismissal on its determination that Florida law did not recognize a cause of action for negligent use of excessive force. *Id.* at 1263.

The Eleventh Circuit reversed and directed the district court to allow the negligence claim to proceed. In so doing, it held that "Florida law . . . clearly recognizes a cause of action for the negligent handling of a firearm . . . separate and distinct from the excessive force claim." *Id.* The court thus began with the premise that, under Florida law, no negligence claim would lie if the evidence permitted only the conclusion that the officers intentionally shot plaintiff. But at the motion to dismiss stage, it was not possible to determine whether the officers' conduct was negligent or intentional. *Id.* at 1264. Because the factual allegations in the complaint could

support an inference of *either* negligent *or* intentional conduct, the case could proceed to discovery.

I conclude that *Shilo* misinterpreted *Lewis* in two critical respects. First, it took a rule about *ultimate liability* and improperly applied it as a summary judgment screening tool. *Lewis* stated that, under Florida law, if a defendant is found *liable* for use of excessive force under the Fourth Amendment, that defendant could not for the same conduct be found *liable* for negligence. *Lewis* also suggested that, in some cases, discovery might eliminate negligence as a viable claim. *See id.* ("Although discovery may reveal that the shooting was an intentional act and negligence played no part, at the motion to dismiss stage our review is limited to the allegations in the complaint construed in the light most favorable to the plaintiff.") But nothing in *Lewis* suggests that excessive force and negligence claims based on the same set of facts *never* can proceed to trial together.

*Lewis* did say that, when a negligence claim is maintained in conjunction with a claim for excessive force, "the negligence component must pertain to something other than the actual application of force during the course of the arrest." *Id.* at 1263 (quoting *City of Miami v. Sanders*, 672 So.2d 46, 48 (Fla. Dist. Ct. App. 1996)). But *Lewis*'s holding makes plain that the Eleventh Circuit did not take this to mean that any negligence claim predicated on the same events as an excessive force claim had to be thrown out of court. Rather, *Lewis* stands for the opposite proposition: that when the facts underlying a negligence and excessive force claim fairly could support an inference of liability on *either* claim, the negligence claim may proceed. That rule should apply at both the motion to dismiss and summary judgment stages, and I conclude that *Shilo* misinterpreted *Lewis* in holding otherwise.

Second, *Shilo*'s reasoning is flawed because it extended *Lewis*'s rule beyond excessive force claims to all § 1983 claims. *Lewis*'s reasoning is specific to the excessive force context, because excessive force claims are constitutional analogs to intentional torts in that they require an *intentional* application of force. I see no reason why that reasoning should be extended to all Fourth Amendment claims, many of which do not require any showing of intent. *See al-Kidd*, 563 U.S. at 739 (stating that Fourth Amendment claims regarding "suspicionless searches" are evaluating using an "objective reasonableness" standard). Here, for example, plaintiff's negligence claim centers on whether the individual officers breached their duty to perform a thorough and competent investigation before making an arrest decision. There is no conflict between a jury finding defendants liable on that negligence theory and simultaneously finding that the officers' investigation fell short of the Fourth Amendment's objective reasonableness standard.

*Shilo*'s holding has been consistently applied in this District for many years. But, as explained above, I am not persuaded by *Shilo*'s reasoning. I therefore must consider whether there is some other reason to grant defendants summary judgment on plaintiff's negligence claim.

Nothing in the text of § 1983 suggests that Congress intended to preclude state-law negligence claims based on the same facts underlying a civil rights claim. Perhaps for that reason, at least two other district judges in the Ninth Circuit have declined to adopt *Shilo*'s reasoning when asked to do so. *See Dougall v. City of Tucson*, 2017 WL 1210340, *7 n.16 (D. Ariz. Mar. 31, 2017); *Estate of Lopez ex rel. Lopez v. City of San Diego*, 2014 WL 7330874, *12 (S.D. Cal. Dec. 18, 2014). Similarly, nothing in Oregon's case law suggests that § 1983 and negligence claims are inherently incompatible. By analogy, Oregon cases suggest that a plaintiff

could not *ultimately prevail* on claims for intentional infliction of emotional distress and negligence based on the same underlying facts. But such claims may—and do—proceed to trial together. *See, e.g, Hamlin v. Wilderville Cemetery Ass'n*, 313 P.3d 360, 367 n.3 (Or. Ct. App. 2013). That makes sense; proving intent is difficult, and the same evidence often could support competing inferences of intentional conduct and negligence. And if two claims that rest on *competing* inferences from the evidentiary record can proceed to trial, there certainly is no state-law bar to claims based on *the same* (or at least complementary) inferences moving forward together.

I conclude that *Shilo* and the cases that followed applied an incorrect rule, and that nothing in federal or state law requires pretrial dismissal of a negligence claim simply because it rests on the same factual allegations as a civil rights claim under § 1983.[5] The only remaining question is whether there is sufficient evidence in the summary judgment record to support a finding that defendants were negligent. In order to make out a negligence claim under Oregon law, a plaintiff must prove:

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that

---

[5] When an excessive force claim and a negligence claim based on the same underlying factual allegations proceed to trial, there will be some risk that the jury will confuse issues and improperly "subject police officers to liability for negligent use of excessive force." *Shilo*, 2005 WL 3157563 at *2. That risk—which is significant, particularly in view of § 1983's generous attorney's fee rules for prevailing plaintiffs and the conflicting vicarious-liability rules for § 1983 and negligence claims—could be mitigated by the use of carefully crafted jury instructions, creation of special verdict forms, or phased presentation of mental-state questions to the jury. If plaintiff's Fourteenth Amendment claim (which rests on allegations of intentional discrimination) claim were proceeding to trial, those precautions would be necessary in this case. But defendants are entitled to summary judgment on all claims which require proof of intent. There is no inherent incompatibility between finding that the officers here performed a deficient investigation, leading to an arrest unsupported by probable cause, and that the officers were negligent in performing that same investigation. In other words, on the particular facts and claims presented here, a jury could properly hold defendants liable for both negligence and violating the Fourth Amendment.

defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiffs harm, and (5) that plaintiff was within the class of persons and plaintiffs injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Son v. Ashland Cmty. Healthcare Servs.*, 244 P.3d 835, 841 (Or. Ct. App. 2010).

There is sufficient evidence in the summary judgment record to support plaintiff's negligence claim. The fourth prong is met, as it is undisputed that defendants' conduct caused plaintiff's harm. The second and fifth prongs are also met: plaintiff had a protected interest in not being handcuffed, taken to jail, and forced from his home unless those actions were based on a competent investigation which revealed probable cause he had committed a crime. Finally, the first and third prongs, whether the defendant's conduct unreasonably caused a foreseeable risk of harm, track the Fourth Amendment, which requires the officers' actions to be objectively reasonable. Defendants' motion for summary judgment on the negligence claim is therefore denied.

IV.    *Intentional Infliction of Emotional Distress*

Finally, defendants seek summary judgment on plaintiff's intentional infliction of emotional distress ("IIED") claim. This claim is based only on the individual defendants' conduct but is asserted against the City through vicarious liability. In order to prove a claim of IIED, plaintiff must show that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 901 P.2d 841, 849 (Or. 1995) (citation and quotation marks omitted). "Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law." *Harris v. Pameco Corp.*, 12 P.3d 524, 529 (Or. Ct. App. 2000).

Plaintiff's IIED claim fails for two reasons. First, there is insufficient evidence from which a jury could conclude that defendants *intended* to cause plaintiff emotional distress. As explained in Part II, *supra*, the evidence in the summary judgment record cannot support an inference of intentional discrimination. And with respect to the alleged flaws in the individual officers' investigation, there is insufficient evidence that they *intentionally* overlooked inconsistencies in Ms. Castleton's story in order to inflict emotional distress on plaintiff. Second, even drawing all factual inferences in plaintiff's favor, the conduct of the individual officers was not so outrageous that it transgressed the outer bounds of socially tolerable behavior. Defendants are entitled to summary judgment on plaintiff's IIED claim.

## CONCLUSION

Defendants' motion for summary judgment (doc. 55) is GRANTED IN PART and DENIED IN PART as follows: the motion is denied with respect to the Fourth Amendment claim against the individual officers, denied with respect to the vicarious-liability negligence claim against the City, and otherwise granted.

IT IS SO ORDERED.

Dated this 30th day of January 2018.

Ann Aiken
United States District Judge